IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SYED NAQI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BLACKLANE NORTH AMERICA, INC.,<br><br>Defendant. | Case No.<br><br>COLLECTIVE AND CLASS ACTION<br><br>JURY TRIAL DEMANDED |

**COLLECTIVE AND CLASS ACTION COMPLAINT**

Plaintiff Syed Naqi, individually and on behalf of all others similarly situated, brings this class action against Defendant Blacklane North America, Inc. ("Blacklane"), for violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–219, Pennsylvania Minimum Wage Act ("PMWA"), 43 P.S. §§ 333.101–333.115, and the Pennsylvania Wage Payment and Collection Law ("WPCL"), 43 P.S. §§ 260.1–260.45, and for unjust enrichment.

**INTRODUCTION**

1.      Plaintiff was a limousine driver who provided transportation services to Blacklane's customers in Philadelphia and surrounding areas.

2.      Blacklane misclassified Plaintiff, and continues to misclassify other drivers, as independent contractors even though they are employees under federal and Pennsylvania law.

3.      By misclassifying Plaintiff and other drivers as independent contractors, Blacklane has unlawfully avoided paying hourly wages, overtime wages, business expenses, and other employee benefits in violation of the FLSA, PMWA, and WPCL.

4.      Blacklane has also violated federal and state law by imposing monetary penalties on drivers based on their alleged violations of Blacklane's performance standards.

1

5. Blacklane also unjustly enriched itself by telling customers that tips, gratuities, and tolls were included in its rates, then keeping those amounts rather than paying them to the drivers who earned the tips and gratuities and paid the tolls.

**PARTIES**

6. Plaintiff Syed Naqi is an adult individual residing in Lehigh County, Pennsylvania.

7. Plaintiff was, at all relevant times, an "employee" of Blacklane within the meaning of the FLSA, PMWA, and WPCL.

8. Defendant Blacklane North America Inc. ("Blacklane") is a foreign corporation registered in Delaware with its principal place of business at 252 NW 29th Street, Suite 927, Miami, Florida, 33127.

9. Blacklane was, at all relevant times, Plaintiff's "employer" within the meaning of the FLSA, PMWA, and WPCL.

10. At all material times, Blacklane purposefully availed itself of the privilege of conducting business in Pennsylvania by recruiting and contracting with Pennsylvania drivers, including Plaintiff; by providing chauffeur services to Pennsylvania customers; by directing Plaintiff to perform work in Pennsylvania; and by collecting payment for services rendered in Pennsylvania. The claims in this action arise directly from Blacklane's Pennsylvania-directed contacts.

**JURISDICTION AND VENUE**

11. This Court has subject-matter jurisdiction over Plaintiff's federal claims under 29 U.S.C. § 216(b).

12. This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367.

2

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district, including Plaintiff's performance of chauffeur services, Blacklane's exercise of control over Plaintiff's work, and Blacklane's failure to pay wages owed.

**FACTUAL BACKGROUND**

**I.     Blacklane's Transportation Business**

14.     Blacklane is a transportation company that provides chauffeur services in the United States and other countries.

15.     Customers can order limousine services through Blacklane's mobile phone application and website, https://www.blacklane.com.

16.     Blacklane advertises its business as a "Chauffeur Service," including on the Apple App Store.

17.     Blacklane describes itself as providing "[s]afe and secure travel" in a "sanitized vehicle driven by a professional[.]"

18.     According to its website, "Blacklane's limousine service fleet can be tailored to fit a variety of needs: our regular Business Class vehicle can be used for either as a simple A-to-B journey or hired by the hour for maximum flexibility on the part of the passenger." *See* https://www.blacklane.com/en/limousine-service/ (Sept. 3, 2024).

19.     On its Instagram page, Blacklane often posts the tagline, "You thrive. We'll drive."

20.     Using Blacklane's mobile phone application, customers can request immediate services or schedule one-way rides or hourly services.

3

## II.    Blacklane's Onboarding Process for Drivers

21.    Drivers who want to work for Blacklane must apply through Blacklane's "Onboarding Portal."

22.    All drivers must complete Blacklane's mandatory training program before providing services to customers.

23.    Blacklane's training modules cover topics such as "Chauffeur Values – Prioritize Safety" and "Reviewing Rides and Waiting Time Policy."

24.    Each Blacklane training module requires the driver to watch a video and take a test about the module's content.

25.    The driver must pass the test to access the next training module.

26.    Drivers must complete all training modules before Blacklane will offer them work assignments.

27.    Blacklane's driver training programs continue past the onboarding process.

28.    Drivers "[r]eceive regular performance updates and gain access to continually updated training modules."

## III.    Blacklane's "Operational Guidelines."

29.    When driving for Blacklane, Plaintiff and other drivers have to "adhere to" Blacklane's "Operational Guidelines" and "standards" to "ensure loyal customers and sustainable business."

30.    Blacklane's "Operational Guidelines" impose the following requirements and standards on drivers:

a.    "Fulfill any special requests. For airport pickups, confirm flight number and arrival time."

4

b.    "Monitor for any flight updates, delays, or early arrivals to adjust the pickup time before departing from your location. You must do this before pressing the 60 minute button in case of any changes in flight arrival time."

c.    "For airports and train station pickups, please remember that the scheduled pickup time may not be the same as the actual flight or train arrival. Guests may choose to have a buffer time between flight arrival and pickup time to allow for enough time to get through customs and collect their luggage — in fact, we recommend it. If a flight is **early or delayed**, please recalculate the pickup time accordingly, including the same amount of buffer time requested by the guest."

d.    "Wear a suit and tie in a single dark color (black, dark grey, or dark blue). A long sleeve, white shirt and black dress shoes, either Oxfords or Derbys."

e.    "Ensure your vehicle meets safety and hygiene standards. Only Blacklane branding visible."

f.    "Only the chauffeur and vehicle assigned to the ride or otherwise authorized by Blacklane may be used to provide the service."

g.    "To provide appropriate trip information to passengers, push '60 min prior pick up' 60 to 90 mins prior to pickup time."

h.    "Pursuant to the terms of the booking, arrive 10 minutes early to the pickup location and press the corresponding app button to inform the guest."

i.    "Use the pickup sign provided in the confirmation email and app. Use a tablet to display it in order to provide secure identification to guests. We recommend using a tablet no more than 4 years old, with a minimum screen size of 9.7 inches (250mm)."

5

j. "For non-airport pickups, please wait for the guest outside the vehicle and refrain from contacting them before the pick up time. It is essential to represent yourself well in public, appearing alert and ready to greet the guest."

k. "Avoid contacting guests before the designated waiting time is finished. If you are unable to contact the guest after the wait time has ended, please contact the Partner Care team to approve a no-show before leaving pickup location."

l. "In order to provide secure identification of passengers and final destination, the chauffeur must provide their name, identify Blacklane, and must confirm the following with passengers upon introduction: CITY, LAST NAME, DESTINATION."

m. "Drivers must also provide luggage assistance to all travelers pursuant to the terms of the booking. This can be accomplished informally by saying, for example, 'Welcome ('to CITY' if relevant), Ms./Mr./Mx. (NAME), I am your Blacklane chauffeur. We are driving to (DESTINATION), correct? Allow me to take your luggage.'"

n. "Provide guest assistance per livery industry standards for the area in which the services are provided. (This could include, for example, opening doors for guests and stowing any luggage or assistive devices)."

o. "If the guest can't be found after you have attempted to contact them, please call Blacklane to request a no-show."

p. "In order to appropriately document the ride, push 'Passenger on board' before starting the engine."

q. "Make sure to ask the guest if they would like any adjustments to the temperature, and if they have a preference for the radio station/music, or if they would like to connect their device via Bluetooth."

r.      "As a final confirmation of the booking terms and destination, tell the guest an estimated arrival time, taking potential traffic into account. Inform the guest that any extra stopovers or wait time will incur additional charges."

s.      "Drive safely, abide by regulations, and avoid distractions/calls when guests are present."

t.      "Confirm with the guest that it's the right destination. Let them out on the appropriate side of the street."

u.      "Fees, tolls, etc. are included and paid digitally — do not take cash payment for rides and do not ask for tips."

v.      "Provide guest assistance per livery industry standards for the area in which the services are provided. (This could include, for example, opening the doors and bringing luggage to the curb.) Contact Blacklane if a guest leaves any items in the car."

w.      "Make sure that the guest has not left any belongings behind in the vehicle. If you find a lost item, please place it in the boot/trunk or glove compartment of your vehicle and immediately contact the Partner Care team."

x.      "To complete the trip, push the 'Finished ride' button after the guest has reached their destination."

31.    Blacklane provides to drivers, "for future reference," an "operational guidelines leaflet."

## IV.    Blacklane's Quality Standards

32.    Plaintiff and other drivers must also satisfy the following requirements from Blacklane's "Quality Standard":

a.      "Avoid sensitive topics and do not force conversation."

b.      "[D]o not take cash payment for rides and do not ask for tips."

c.    "Dress professionally: dark suit, button-up shirt, tie, and polished shoes."

d.    "Do not solicit Blacklane customers for further business."

e.    "Never share any private guest information or the details of our partnership."

f.    "Ensure you can fulfill any requests in the booking before accepting it (e.g. child seat, wheelchair)."

g.    "Keep the luggage compartment empty to accommodate guests' luggage."

h.    "Provide bottled water and, if possible, tissues, mints/gum, and Wi-Fi."

i.    "Only accept rides you are 100% sure you can perform. Always consider wait time and special requests."

j.    "Do not call [Blacklane] to negotiate prices, we will contact you if needed."

k.    "[P]erform all accepted rides."

l.    Ensure that "the chauffeur assigned to the ride in Blacklane's system" performs the trip.

m.    "[S]peak enough English to have a basic conversation with international guests."

n.    Use a vehicle that is "clean, in good condition, and match[es] the booked service class."

o.    "Arrive 10 minutes early to the pickup location and press the corresponding app button to inform the guest and Blacklane."

p.    "Use the pickup sign provided in the confirmation email and app. Use a tablet to display it."

q.      "If the guest can't be found after attempts to contact them, call us for authorization to leave the site."

r.      "Ask the guest if they would like any music or temperature adjustments."

s.      "Know the area, but use GPS when appropriate. Inform the guest that any extra distance or wait time can incur additional charges."

t.      "Say, 'Thank you for riding with Blacklane today. I hope you enjoyed your ride and that we'll see you again soon. Have a good day.'"

## V.      Blacklane 10-Point Vehicle Inspection

33.      Blacklane also "expect[s]" its drivers to perform a 10-point vehicle inspection "before each ride" requiring the following:

a.      "**Cleanliness:** The vehicle is clean inside and out and follows the service standards."

b.      "**The Front Seats:** The guest seat is at a 90 degree angle for guest comfort. The chauffeur's seat does not exceed the B-pillar."

c.      "**The Armrest:** The armrest is down, closed, and contains only the desired amenities."

d.      "**Water:** There are two bottles of water (one sparkling and one still, 50cl) in the middle armrest."

e.      "**The Trunk:** It is clean, uncluttered and has no visible elements."

f.      "**Phone Chargers:** The vehicle has two white, original chargers (USB-C for Android and Lightning for iPhone)."

g.      "**Personal Belongings:** No visible belongings, the center console is closed, there are no items in the chauffeur door, or the guest front seat. Nothing is hanging from the inside mirrors."

9

h.      **"Phone Holder:** Only one phone holder, placed out of the guests [SIC] line of sight, with the sound off."

i.      **"Radio & Temperature:** The radio is turned off and preset to jazz or classical. The air conditioner is on to ensure that the air is circulated and renewed. The recommended temperature is between 20-22 degrees."

j.      **"The Refresh:** After every guest, the vehicle is refreshed to ensure that it is clean, and well stocked."

## VI.    Other Forms of Blacklane's Control

34.     Blacklane also uses its unilateral control to set other policies detrimental to Plaintiff and other drivers.

35.     For example, Blacklane offers customers "complimentary wait time"—that is, unpaid time for the driver—of up to "one hour for airport and long-distance train station pickups, and 15 minutes for all other pickups."

36.     Blacklane also allows customers to modify their booking at any time, including during the trip.

37.     Drivers who refuse to perform services pursuant to the customer's modifications violate Blacklane's rules and are subject to monetary penalties.

38.     Similarly, Blacklane requires drivers to follow the customer's preferred route, even though the fare is based on Blacklane's predetermined route.

39.     Blacklane also has a "no-show policy" requiring drivers to wait at least 30 minutes for a "standard transfer" and 60 minutes for an "airport pickup."

40.     "If a guest does not show up after the included waiting time has passed and [the driver is] unable to wait longer, then [the driver] must contact Blacklane to request a no-show before the no-show can be approved."

41.    After a driver requests a "no-show," Blacklane decides whether to charge the customer and pay the driver.

42.    Blacklane has also unilaterally established a customer cancellation policy that allows customers "to cancel their ride free of charge up until 1 hour before the scheduled pickup time."

43.    Blacklane describes its customer cancellation policy as "the most customer-friendly policy in the industry."

44.    When a customer cancels the ride within one hour of the scheduled pickup time, the driver does not receive any pay, even if the driver has already begun driving to the pickup location or turned down other work to perform the trip.

45.    Although these modifications may result in more work for the driver, Blacklane—and not the driver—decides whether to charge the customer for the additional services.

## VII.    Blacklane's Monetary Penalties

46.    To ensure that drivers comply with its "Operational Guidelines," "Quality Standard," "Vehicle Checklist," and other policies, Blacklane imposed monetary penalties on drivers for a variety of "incidents"—that is, noncompliance with its policies, rules, and standards.

47.    Blacklane provided to drivers the following table to drivers listing its "incident types" and the associated monetary "penalty":

| Incident Type | Tier | Penalty | Secondary Penalty |
|---|---|---|---|
| Requested cash payment | 1 | 100% + No Pay | - |
| Wrong chauffeur - Subcontracting | 1 | 100% + No Pay + Contractual Penalty | - |

11

| | | | |
|---|---|---|---|
| Wrong vehicle - Subcontracting | 1 | 100% + No Pay + Contractual Penalty | - |
| Solicited guest | 1 | 100% + No Pay + Contractual Penalty | - |
| Disclosed private information (FCTSA) | 1 | 100% + No Pay + Contractual Penalty | - |
| Harmful behavior | 1 | 100% + No Pay | - |
| Dangerous Driving | 1 | 100% | - |
| No pickup | 1 | 100% + No Pay | - |
| Poor Driving Skills | 2 | 50% | 10% |
| Car Fault: Mechanical | 2 | 50% | 10% |
| Late for Pickup > 5 minutes | 2 | 50% | 10% |
| Missing baby seat | 2 | 50% | 10% |
| No ride confirmation 45 minutes ahead | 2 | 50% *Will also apply to the Americas.* | 10% |
| No Meet & Greet | 2 | 50% | 10% |
| Late for Pickup < 5 minutes | 3 | 25% | 5% |
| Chauffeur attire expectations | 3 | 25% | 5% |
| Visible damage | 3 | 25% | 5% |
| Vehicle was dirty | 3 | 25% | 5% |
| Asked for tip | 3 | 25% | 5% |
| Chauffeur Manners | 3 | 25% | 5% |
| Giving back a ride | 3 | <ul><li>>24h to pickup time, no penalty</li><li>6 - 24h - 20%</li><li>2-6 - 40%</li><li>45mins - 2h - 60%</li></ul> | - |

| | | • **London**: 45mins - 24 hours - 20% | |
|---|---|---|---|
| No water | 3 | 25% | 5% |
| No chargers | 3 | 25% | 5% |
| Smell in vehicle | 3 | 25% | 5% |
| Incorrect journey extras | 3 | 25% | 5% |
| Missed other service standard | 3 | 25% | 5% |
| Did not ask the three guest preferences | 3 | 25% | 5% |
| Communication skills | 3 | 25% | 5% |
| Initiated conversation with guest | 3 | 25% | 5% |
| Unprofessional conversation | 3 | 25% | 5% |
| Did not follow guest's special request | 3 | 25% | 5% |
| Accident | N/A | No Penalty | No Penalty |
| Vehicle is old / doesn't like vehicle type | N/A | No Penalty | No Penalty |
| Lost & Found/Damaged item | N/A | No Penalty | No Penalty |
| Was rude to Blacklane crew | N/A | No Penalty | No Penalty |
| Extra Luggage Issue | N/A | No Penalty | No Penalty |

48.     Blacklane also charges drivers a "handling fee" on "all incidents to account for Blacklane's amount of effort and time required to resolve the issue resulting from the incident.

49.     Blacklane also imposes "secondary penalties" when "two or more incident types are recorded for a single booking."

50.     Upon information and belief, "contractual penalty" refers to Blacklane terminating the driver's employment.

51.     Blacklane also imposes monetary policies on drivers who fail to complete assignments.

52.     Blacklane refers to driver cancellations as "give backs."

53.     Under its "give back" policy, Blacklane imposes the following penalties on drivers "when the ride is returned":

| Time of give-back (Before original pick up time) | Penalty (% of original ride price) |
|---|---|
| 24 hours or more | 0% |
| 6-24 hours | 20% |
| 2-6 hours | 40% |
| 45 minutes- 2 hours | 60% |

54.     For example, "[i]f the ride pickup time is 9 a.m. on Sunday and the ride was given back at 6 a.m. on Sunday, a 40% penalty would apply."

55.     Penalties appear in the driver's next monthly invoice.

56.     Despite imposing cancellation penalties, Blacklane prohibits drivers from delegating rides to another driver.

57.     When a driver "gives back" an assignment, Blacklane offers the assignment to other drivers.

58.     The driver who "gave back" the assignment is penalized regardless of whether Blacklane found another driver to cover the assignment.

## VIII.   Blacklane's Assignment System

59.     Besides monetary penalties, Blacklane uses its work assignment process to ensure drivers like Plaintiff comply with Blacklane's policies and quality standards.

60.     Blacklane posts available work assignments to two virtual job boards.

61. One job board lists fixed-pay assignments, while the other functions as a reverse auction.

62. Which job board a driver can access depends on the driver's rating.

63. Customers are prompted to rate their driver using a five-star scale after each ride.

64. Drivers rated at least 4.9 stars over the last 90 days can access the fixed-pay job board.

65. The first driver who accepts the fixed pay assignment on the job board receives the work.

66. For this reason, drivers must constantly monitor the fixed-pay job board to gain access to economically feasible fares.

67. Drivers with a rating below 4.9 stars must "bid" on work assignments in a reverse auction, with the assignment going to the driver who accepts the lowest pay.

68. Because the reverse auction process drives down the pay amount, drivers strive to maintain a rating of at least 4.9 stars so that they receive fixed-pay work assignments.

69. The number of "offerings" that each driver receives from Blacklane also depends on the driver's total number of "give backs"—that is, cancellations—and "incidents"—that is, violations of Blacklane's operating guidelines.

70. By its own admission, Blacklane designed its work assignment system to "incentivize better planning and scheduling for our chauffeurs, ultimately leading to improved service delivery and higher guest satisfaction."

71. In other words, Blacklane uses its work assignment system to control the quality of services that drivers like Plaintiff provide.

IX.    **Blacklane's Pricing and Payment Processing**

72.    Blacklane also controls the pricing for services that drivers like Plaintiff provided to Blacklane customers.

73.    Blacklane also prohibits drivers from negotiating prices directly with customers.

74.    Although Blacklane does not share its pricing formula with drivers or customers, its website states that "[r]ates are determined by the distance/duration (depending on whether it's a one-way ride or a booking by the hour)."

75.    "Additional factors that influence [Blacklane's] rates include pickup time, Meet & Greet service at airports, and how far in advance the ride was booked."

76.    Blacklane also prohibits drivers from accepting payment outside the Blacklane platform.

77.    Blacklane instructs customers, "If a chauffeur requests any form of payment or advertises alternative services, please let us know by providing feedback after the ride."

78.    For these reasons, drivers cannot ensure that a customer pays for services.

79.    Drivers are entirely reliant on Blacklane to collect payment from customers.

80.    Blacklane also unilaterally decides when to pay drivers.

81.    For instance, even though Blacklane usually collects payment from customers immediately after a trip, Blacklane pays its drivers monthly.

82.    Blacklane customers cannot request a specific driver through Blacklane's platform.

83.    For these reasons, when a driver provides high-quality services to a Blacklane customer, it benefits only Blacklane.

16

## X.    Gratuities and Tolls

84.    Blacklane tells customers, "Tips and gratuities are already included in our rates, as well as all taxes, tolls, and fees."

85.    Despite telling customers that tips, gratuities, or tolls are included, Blacklane does not remit any tips, gratuities, or tolls to the driver.

86.    Upon information and belief, Blacklane's rates are higher than they would be absent the "tips included" representation, and customers pay those inflated rates in reliance on Blacklane's assurance that the gratuity component will reach the driver. Instead, Blacklane retains the entire fare, including the portion customers reasonably understand to be a tip or gratuity.

## XI.    Plaintiff's Work for Blacklane

87.    Plaintiff began driving for Blacklane as a chauffeur in July 2023.

88.    Plaintiff completed his last trip for Blacklane in November 2024.

89.    Since then, Blacklane has cut off Plaintiff's access to the Chauffeur App, including his trip history and payment records.

90.    Despite exercising the control described in preceding paragraphs, Blacklane classified Plaintiff as an independent contractor rather than an employee.

91.    Because of that misclassification, Plaintiff bore business expenses that Blacklane should have paid, including, without limitation, tolls, fuel, vehicle maintenance, car washes, insurance premiums, vehicle finance payments, and cell phone fees.

92.    The foregoing expenses drove Plaintiff's effective hourly wage below the minimum wage.

93.     Blacklane also failed to pay Plaintiff for all hours worked. For example, Plaintiff spent unpaid time engaging Blacklane's training modules, monitoring the App for assignments, tracking customer flights, and waiting for customers to arrive.

94.     Plaintiff regularly worked more than 40 hours per week for Blacklane, but Blacklane never paid him an overtime premium.

95.     Plaintiff regularly drove passengers across state lines among New Jersey, Pennsylvania, and New York. These interstate trips were a routine and integral part of the work Blacklane assigned him.

<strong>COLLECTIVE ACTION ALLEGATIONS</strong>

96.     Plaintiff brings this action under 29 U.S.C. § 216(b) on behalf of himself and all other persons who performed chauffeur services for Blacklane in Pennsylvania and whom Blacklane classified as independent contractors.

97.     Plaintiff and members of the collective are similarly situated because they performed similar or identical job duties and were subjected to the same unlawful worker misclassification policy.

98.     Blacklane's violations were willful, entitling Plaintiff and members of the collective to a three-year statute of limitations under the FLSA.

<strong>CLASS ACTION ALLEGATIONS</strong>

99.     Plaintiff brings his claims on behalf of a class pursuant to Rule 23 of the Federal Rules of Civil Procedure.

100.    Plaintiff seeks certification of a class consisting of:

All persons who performed chauffeur services for Defendant in Pennsylvania and whom Defendant classified as independent contractors at any time within the applicable limitations period.

101.    Plaintiff and Class Members have been uniformly misclassified as independent contractors by Blacklane.

102.    The Class is so numerous that joinder into a single action is impracticable. Although the exact number of Class Members cannot be properly determined without further discovery, the number and identity of the Class Members can easily be ascertained from Blacklane's records.

103.    Based on the above allegations, there are questions of law and fact that affect and are common to all Class Members.

104.    The central questions of law and fact involved in this action are of common or general interest.

105.    Such common questions include, without limitation:

a.      Whether Plaintiff and Class Members qualified as Blacklane's employees under Pennsylvania law;

b.      Whether the monetary penalties that Blacklane imposed on Plaintiff and Class Members are unlawful withholdings, deductions, or diversions under Pennsylvania law; and,

c.      Whether Blacklane unlawfully withheld tips and gratuities belonging to Plaintiff and Class Members.

106.    Proceeding as a class action is superior to numerous individual actions and will promote judicial economy and consistent adjudication.

107.    Individual litigation would be economically infeasible for class members and would unnecessarily burden the courts.

108.    Plaintiff will fairly and adequately represent the interests of the class and has no interests antagonistic to those of the Class.

109.    Absent class certification, Blacklane will retain the benefits of its unlawful practices and Class Members will be left without an adequate remedy.

110.    Class litigation is necessary because individual actions would create a risk of inconsistent adjudications that could establish incompatible standards of conduct for Blacklane and the Class.

111.    Certification of the Class will ensure uniform resolution of common questions of law and fact and will protect Class Members' rights through a single, efficient proceeding.

112.    Plaintiff's counsel is experienced in wage-and-hour litigation and will adequately represent the class.

## FAA SECTION 1 EXEMPTION

113.    The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, contains an exemption in Section 1 for "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Plaintiff and members of the Collective and Class qualify for this exemption and are therefore not subject to any alleged arbitration agreement that may exist between the parties.

114.    Blacklane chauffeurs, as a class, are engaged in interstate commerce.

115.    Blacklane's core business model is fundamentally connected to interstate and international travel.

116.    Blacklane markets itself as a premium "city-to-city" chauffeur service, offering transportation services that connect travelers across metropolitan areas and state lines. Blacklane offers specialized services including "City-to-Slopes" and "City-to-Beach" routes that by their nature involve long-distance, often interstate transportation.

20

117.    Blacklane also has formal partnerships with major international airlines that integrate its chauffeur services directly into airline travel. For example, Blacklane has a strategic partnership with Emirates Airlines, one of the world's largest international carriers. Through this partnership, Emirates First Class and Business Class passengers can book Blacklane chauffeur services as part of their integrated travel experience. This direct integration with international airline travel demonstrates that Blacklane's business—and the work of its chauffeurs—is inherently connected to interstate and international commerce.

118.    Blacklane's Operational Guidelines require drivers to monitor "flight number and arrival time," track "flight updates, delays, or early arrivals," and adjust pickup times for "airports and train station pickups." These requirements confirm that Blacklane's business is designed around serving travelers engaged in interstate and international journeys.

119.    Blacklane's service platform contemplates and enables interstate travel as a core function. Customers can book point-to-point travel between cities across state lines. Blacklane prices its services based on "distance/duration," expressly anticipating that chauffeurs will transport passengers over significant distances, often crossing state boundaries. This is fundamentally different from Uber and Lyft's model of short, local trips.

120.    For example, a significant number of trips that Plaintiff performed for Blacklane required him to transport customers across state lines.[1] Many of these trips began at the Philadelphia International Airport and ended in New York City.

121.    These interstate trips were neither incidental nor rare.

---

[1] Blacklane has cut off Plaintiff's access to his trip records in the Blacklane Chauffeurs App.

122.　Upon information and belief, Blacklane's own records will show that interstate trips and airline-booked trips make up a substantial share of its United States business, including in Pennsylvania.

123.　Blacklane's own "U.S. Terms of Use (Chauffeurs App)" states that the work performed by Plaintiff and other drivers "arises out of a matter affecting and influencing interstate commerce."

124.　For these reasons, Plaintiff and members of the collective and class are "transportation workers" who belong to a "class of workers engaged in foreign or interstate commerce" within the meaning of 9 U.S.C. § 1. Any arbitration agreement between Blacklane and Plaintiff or class members is therefore exempt from the FAA and unenforceable under federal law.

### FIRST CAUSE OF ACTION
### FLSA Violations

125.　Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

126.　At all relevant times, Blacklane was an "employer" of Plaintiff and members of the FLSA Collective within the meaning of 29 U.S.C. § 203(d), and Plaintiff and members of the FLSA Collective were "employees" of Blacklane within the meaning of 29 U.S.C. § 203(e).

127.　Blacklane was engaged in interstate commerce and had annual gross revenues exceeding $500,000, satisfying the FLSA's enterprise coverage requirements under 29 U.S.C. § 203(s)(1)(A).

128.　Alternatively, Plaintiff and members of the FLSA Collective were individually engaged in interstate commerce because they transported passengers across state lines and served customers traveling in interstate commerce, satisfying the FLSA's individual coverage requirements under 29 U.S.C. § 206(a) and § 207(a).

129.   Blacklane misclassified Plaintiff and members of the FLSA Collective as independent contractors when, under federal law, they were employees.

130.   By misclassifying Plaintiff and members of the FLSA Collective as independent contractors, Blacklane violated 29 U.S.C. § 206(a) by failing to pay the federal minimum wage of $7.25 per hour for all hours worked, including time spent completing mandatory training, waiting for customers during unpaid "complimentary wait time," monitoring flight arrivals, and traveling to pickup locations.

131.   By misclassifying Plaintiff and members of the FLSA Collective as independent contractors, Blacklane violated 29 U.S.C. § 207(a)(1) by failing to pay overtime compensation at a rate of one and one-half times the regular rate for all hours worked in excess of forty hours per workweek.

132.   Blacklane further violated the FLSA by unlawfully retaining tips and gratuities belonging to Plaintiff and members of the FLSA Collective. Blacklane represented to customers that "[t]ips and gratuities are already included in our rates." Despite this representation, Blacklane did not remit any tips or gratuities to drivers. Under 29 U.S.C. § 203(m)(2)(B), tips are the property of the employee, and an employer may not keep tips received by employees for any purpose, whether or not the employer takes a tip credit.

133.   Blacklane further violated the FLSA by making unlawful deductions from the wages of Plaintiff and members of the FLSA Collective through its system of monetary penalties for alleged violations of Blacklane's Operational Guidelines, Quality Standards, and other policies. These deductions reduced compensation below the federal minimum wage in violation of 29 U.S.C. § 206.

134.    Blacklane's violations of the FLSA were willful. Blacklane knew or showed reckless disregard for whether its conduct violated the FLSA. Blacklane deliberately structured its relationship with drivers using an "independent contractor" label while exercising the control and oversight characteristic of an employment relationship. Blacklane's detailed Operational Guidelines, penalty system, and training requirements demonstrate that Blacklane understood the level of control it exercised over drivers.

135.    Because Blacklane's violations were willful, Plaintiff and members of the FLSA Collective are entitled to recover unpaid wages for a period of three years preceding the filing of this Complaint pursuant to 29 U.S.C. § 255(a).

136.    Plaintiff and members of the FLSA Collective are entitled to recover unpaid minimum wages, unpaid overtime compensation, liquidated damages in an amount equal to unpaid wages, prejudgment interest, reasonable attorneys' fees, and costs pursuant to 29 U.S.C. § 216(b).

## SECOND CAUSE OF ACTION
### PMWA Violations

137.    Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

138.    At all relevant times, Blacklane was Plaintiff's and Class Members' "employer" within the meaning of the PMWA, 43 P.S. § 333.103(g), and Plaintiff and Class Members were Blacklane's "employees" within the meaning of the PMWA, 43 P.S. § 333.103(h).

139.    Blacklane misclassified Plaintiff and Class Members as independent contractors when they were employees under the PMWA.

140.    By misclassifying Plaintiff and Class Members as independent contractors, Blacklane violated the PMWA, 43 P.S. § 333.104(a), by failing to pay the Pennsylvania minimum wage for all hours worked, including time spent completing mandatory training,

waiting for customers during unpaid "complimentary wait time," monitoring flight arrivals, and traveling to pickup locations.

141.    By misclassifying Plaintiff and Class Members as independent contractors, Blacklane violated the PMWA, 43 P.S. § 333.104(c), and its implementing regulations, 34 Pa. Code § 231.41, by failing to pay overtime compensation at a rate of one and one-half times the regular rate for all hours worked in excess of forty hours per workweek.

142.    Blacklane further violated the PMWA by unlawfully retaining tips and gratuities belonging to Plaintiff and Class Members.

143.    Under Pennsylvania's Minimum Wage Act Regulations, 34 Pa. Code Chapter 231, all tips and gratuities are the property of the employee.

144.    Blacklane represented to customers that tips and gratuities are "included" in its rates but did not remit any portion of those amounts to Plaintiff and Class Members.

145.    Plaintiff and the Class are entitled to all available relief under the PMWA, including unpaid wages, unpaid overtime, prejudgment interest, attorneys' fees, and costs.

### THIRD CAUSE OF ACTION
### WPCL Violations

146.    Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

147.    At all relevant times, Blacklane was Plaintiff's and Class Members' "employer" within the meaning of the WPCL, 43 P.S. § 260.2a, and Plaintiff and Class Members were Blacklane's "employees" within the meaning of the WPCL, 43 P.S. § 260.2a.

148.    Blacklane violated the WPCL, 43 P.S. § 260.3, by failing to pay Plaintiff and Class Members all wages earned, including minimum wages for all hours worked and overtime compensation for hours worked in excess of forty per workweek.

25

149.    Blacklane further violated the WPCL, 43 P.S. § 260.3, by making unauthorized deductions from the wages of Plaintiff and Class Members through its system of monetary penalties for alleged violations of Blacklane's Operational Guidelines, Quality Standards, and other policies. The WPCL prohibits employers from making deductions from wages except as provided by law or authorized by the employee for the employee's benefit.

150.    Blacklane further violated the WPCL by unlawfully withholding tips and gratuities that belonged to Plaintiff and Class Members. Blacklane represented to customers that tips and gratuities were "included" in its rates but retained those amounts rather than paying them to the drivers who earned them.

151.    As a direct and proximate result of Blacklane's violations of the WPCL, Plaintiff and Class Members have suffered damages, including lost wages, lost overtime compensation, and withheld tips and gratuities.

152.    Plaintiff and the Class are entitled to all available relief under the WPCL, including unpaid wages, unpaid overtime, statutory liquidated damages, prejudgment interest, attorneys' fees, and costs.

### FOURTH CAUSE OF ACTION
### Unjust Enrichment

153.    Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

154.    Plaintiff and Class Members conferred benefits on Blacklane in two ways. First, they provided valuable chauffeur and transportation services to Blacklane's customers, for which Blacklane collected payment. Second, they paid out of pocket the tolls incurred on Blacklane trips, expenses that Blacklane had already charged its customers.

155. Blacklane appreciated and knowingly accepted these benefits. Blacklane collected payment from customers for the services Plaintiff and Class Members provided and retained a substantial portion of those payments.

156. Blacklane told its customers that tips, gratuities, and tolls were "already included in [its] rates." Blacklane's pricing, marketing, and booking materials repeated this representation, and Blacklane charged customers rates that reflected it.

157. Blacklane's representation had its intended effect. Customers who would otherwise have tipped their drivers directly did not, because Blacklane assured them the gratuity was built into the fare. Customers reasonably understood that the tip and toll components of their payments would go to the drivers who earned the tips and paid the tolls.

158. They did not. Blacklane paid no tips or gratuities to Plaintiff or Class Members and did not reimburse the tolls they paid. Blacklane kept the money. Blacklane thus collected funds designated for its drivers, intercepted them, and retained them as revenue.

159. Blacklane was enriched at Plaintiff's and Class Members' expense in at least three ways: (a) it retained the tip and gratuity component of customer payments that customers intended for drivers; (b) it retained the toll component of customer payments while drivers bore the toll expense themselves; and (c) it profited from Plaintiff's and Class Members' labor while failing to pay minimum wages for all hours worked, failing to pay overtime compensation, and imposing unlawful monetary penalties that reduced drivers' compensation.

160. Blacklane accepted and retained these benefits under circumstances that make retention inequitable. A company may not tell customers that the tip is in the fare, price the fare accordingly, and then pocket the tip. Nor may it charge customers for tolls that its drivers pay.

27

161.    As a result of Blacklane's unjust enrichment, Plaintiff and Class Members are entitled to restitution and disgorgement of all amounts by which Blacklane was unjustly enriched, including the tip, gratuity, and toll components of customer payments attributable to trips Plaintiff and Class Members performed, and all other equitable relief permitted under Pennsylvania law.

162.    This claim does not turn on whether Blacklane classified Plaintiff and Class Members as employees or independent contractors, or on whether that classification was lawful. Even if Plaintiff and Class Members were independent contractors, Blacklane could not tell customers that tips, gratuities, and tolls were included in its rates, collect payment on that representation, and keep for itself the amounts customers intended for the drivers who earned the tips and paid the tolls. Equity does not permit Blacklane to retain money it collected for others, whatever label it placed on its relationship with those drivers.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that the Court enter judgment in his favor and against Defendant Blacklane North America, Inc.:

a.      Certifying the FLSA claims as a collective action under 29 U.S.C. § 216(b);

b.      Certifying the PMWA and WPCL claims as a class action under Rule 23;

c.      Designating Plaintiff as representative of the Collective and Class;

d.      Appointing Plaintiff's counsel as Class and Collective counsel;

e.      Awarding Plaintiff, the Collective, and the Class damages for all unpaid straight-time wages and unpaid overtime wages for all hours worked;

f.      Awarding liquidated and statutory damages;

g.      Awarding restitution and disgorgement;

h.    Awarding pre-judgment and post-judgment interest on all unpaid wages and damages;

i.    Awarding reasonable attorneys' fees, costs, and expenses pursuant to the FLSA, PMWA, and WPCL;

j.    Awarding injunctive or declaratory relief as necessary to end Blacklane's unlawful practices; and

k.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: July 17, 2026                    Respectfully submitted,

Jeremy E. Abay (PA # 316730)
POND LEHOCKY GIORDANO, INC.
2005 Market Street, 18th Floor
Philadelphia, PA 19103
(856) 528-8115
jabay@pondlehocky.com

*Counsel for Plaintiff, the Collective, and the Class*